Filed 10/10/24  P. v. Ozuna CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E080750 |
| v. | (Super.Ct.No. BAF2200440) |
| HECTOR LOPEZ OZUNA, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Timothy J. Hollenhorst, Judge. Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted appellant of assault with a deadly weapon in a stabbing that inflicted great bodily injury, though the victim recanted prior statements identifying appellant as his attacker and at trial accused another person of stabbing him.

Appellant challenges his conviction on three grounds. First, he argues the trial court should not have allowed the jury to hear a recording of the victim saying appellant threatened him to change his testimony because the recording revealed the two were in custody. Second, he complains the victim was allowed to testify the person who stabbed him exclaimed, "You stole from [appellant]," in violation of the hearsay rule. Third, he claims the prosecutor committed misconduct by stating in closing arguments that a knife found in appellant's possession had the victim's blood on it, though police never submitted the evidence for DNA analysis.

We conclude there were no errors. The probative value of the victim's threat revelation, including that it occurred while appellant and victim were both incarcerated, was not substantially outweighed by any prejudicial effect. The victim's testimony was not hearsay because the statement was offered for a purpose other than its truth. The prosecutor's argument did not mischaracterize the evidence because it asked the jury to infer the knife had the victim's blood on it based on the testimony of the detective who found the knife in appellant's backpack and testified the substance was dried blood.

Appellant also challenges the decision not to strike Three Strikes and serious felony prior enhancements. We conclude the trial court did not abuse its discretion by imposing the Three Strikes enhancement and appellant forfeited any objection to the serious felony prior enhancements by failing to raise the issue in the trial court.

2

# I

## FACTS

Appellant and defendant, Hector Lopez Ozuna, Jr., and his victim, Shane Wilcock, knew each other as members of a transient community in Hemet. Wilcock would sometimes stay with Ozuna in his trailer and help him with errands and chores. Wilcock said Ozuna was an older man who needed help because he was partially blind and could not get around easily.

On the evening of September 12, 2021, Wilcock was sitting with another person in a parking lot where transients would gather. Shortly before 7:00 p.m., Ozuna approached them and accused Wilcock of stealing his drugs. When Wilcock denied it, Ozuna stabbed him with a pocketknife. Wilcock suffered a three-inch cut on the upper left side of his chest and a three- to four-inch cut above his left elbow. Wilcock fled, and someone driving by called for help.

When police officers arrived, they found Wilcock sitting on the sidewalk covered in blood and holding his chest. One officer provided medical care while another officer took Wilcock's statement. Wilcock said he was sitting with a friend when a man named Hector accused him of stealing. Wilcock said "he told Hector that he didn't steal anything," and Hector then stabbed him with a two- to three-inch knife. Paramedics transported Wilcock to a local hospital where he was airlifted to another city for treatment, which included surgery.

Based on Wilcock's statement, the responding officers compiled a six-pack photographic lineup that included Ozuna's photograph. Two days after the stabbing, an officer showed Wilcock the lineup, and Wilcock identified Ozuna as his attacker. Wilcock said, "he was a hundred percent certain" of his identification and signed his initials on Ozuna's photograph. Wilcock described Ozuna as "the classic wannabe godfather type" who would dress nicely and give money to other transients, "but when you cross him, he'll light your house on fire." Wilcock also described Ozuna as "the kind of guy that will get high [and] put his dope somewhere" and then be "quick to blame everybody else" when he cannot find it.

Four days after the stabbing, a police detective recognized Ozuna as a suspect in the stabbing and detained him. The detective found a black and brown pocketknife in Ozuna's front right pants pocket and a black pocketknife in a plastic baggie inside his backpack. The black pocketknife had dirt and what appeared to be dried blood on the handle and the blade. The detective collected the knives as evidence and arrested Ozuna. The detective had no knowledge whether the blood had been tested or whether there was a match between the blood on the knife and the victim of the stabbing. However, he testified that he recognized the substance as blood based on his training and experience.

At trial, Wilcock denied Ozuna had stabbed him. Wilcock testified he was sitting in a parking lot with a bald guy he had just met when Ozuna rode up on his bicycle and began accusing him of stealing his drugs. Wilcock said the bald guy seemed to know Ozuna, "got very offended," and "lunged for my backpack and said something in the

4

lines of 'You stole from [Ozuna].'"[1] Wilcock said the bald man then stabbed him from behind using a folding knife with a blue handle and a four-inch serrated blade. Wilcock also testified he never talked to police at the scene. He said he did not remember telling police Ozuna had stabbed him and claimed he did not even know Ozuna's name until trial. He knew Ozuna by his street name, "Crow." Ozuna did not testify or present evidence but instead relied on Wilcock's trial testimony for his defense.

To impeach Wilcock's trial testimony, the prosecution played for the jury Wilcock's own statement that Ozuna had threatened him while they were both incarcerated.[2] While Wilcock was being held in jail on a material witness warrant, he and Ozuna were transported to court on the same bus. According to Wilcock, Ozuna and two of his "goons" sat right behind him and tried to sway his testimony. Ozuna warned Wilcock "how far his reach can go," and said he knew his full name, past and present addresses, and recent movements. He told Wilcock, "[Y]ou know what to do. Tell them I didn't do it." Ozuna also instructed him to say he got stabbed from behind and warned him to "make the right choice . . . or I'll get you. Doesn't matter where you go." Wilcock told the prosecutor the encounter was terrifying. He said he took these threats seriously

---

[1] Defense counsel objected to this testimony as hearsay, but the trial court allowed it because it was "not offered for its truth." Ozuna appeals that ruling.

[2] Defense counsel objected to admitting a recording of this statement as unduly prejudicial because there was no way to admit it without the jury learning that Ozuna was presently in custody. The court held the probative value of the evidence outweighed any prejudice. Ozuna appeals that ruling.

because Ozuna was "the classic wannabe godfather type" who followed through with his threats and Wilcock had "seen him do it."

At trial, Wilcock characterized the encounter differently. He said Ozuna never made any specific threats, and he denied being terrified. He claimed that during his interview he had been paraphrasing what Ozuna said on the bus, and characterized the statements as vague references to knowing Wilcock's name and whereabouts. He admitted, "I may have taken it as a threat . . . and . . . felt threatened because I never wanted to be singled out as . . . a snitch."

In closing argument, defense counsel urged the jury to accept Wilcock's trial testimony as the true version of events. He argued Wilcock's previous unsworn statements to police and the prosecutor were lies and it was not until Wilcock's sworn testimony before the jury that the truth came out. Defense counsel also argued the location of Wilcock's stab wounds, Ozuna's age and diminished physical capacity, and the lack of any forensic or DNA evidence tying appellant's knife to the stabbing supported Wilcock's testimony that he was stabbed by someone else.

The prosecutor's closing encouraged the jury to consider the fact that Wilcock was found in possession of a knife with blood on it. "That second knife that had Shane Wilcock's blood on it that [Ozuna] knew had Shane Wilcock's blood on it, he had placed inside of that plastic bag so it wouldn't contaminate the rest of his contents of his backpack, and concealed that knife in his backpack." The prosecutor argued this evidence gave rise to a reasonable inference that it was the knife used in committing the offense.

"Now, the only reasonable interpretation from [appellant] having that knife in his possession is that that is the knife that he used to stab Mr. Wilcock. You remember, [appellant] is found with two different knives. He has a clean knife. A knife that's not in the plastic bag. A knife that doesn't have blood on it. That's found in his right front pocket. [¶] The knife that has blood on it, the knife he knows has Shane Wilcock's blood on it, that one he places inside of that plastic bag. That one he puts in his backpack. That is the only circumstantial evidence in this case, and that points to [appellant] having been the one that stabbed Mr. Wilcock."

Defense counsel did not object to this argument, but instead emphasized that the prosecution did not test the blood on the knife to see if it was Wilcock's and argued that if it had been the weapon he used in the crime, he would have gotten rid of it, not stored it in a plastic bag in his backpack.

On November 17, 2022, a jury found appellant guilty of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1), unlabeled statutory citations refer to this code) and found he personally inflicted great bodily injury in committing the offense (§ 12022.7, subd. (a)). Ozuna admitted he had served one prior prison term (§ 667.5, subd. (b)), had two serious felony priors (§ 667, subd. (a)) and had two felony strike prior convictions (§§ 667, subds. (c) & (e)(2)(A), 1170.12, subd. (c)(2)).

On February 17, 2023, the trial court denied Ozuna's motion to dismiss his strike priors and sentenced him to a prison term of 33 years to life—25 years to life for the aggravated assault, plus a consecutive three-year term for the great bodily injury

enhancement and a consecutive five-year term for one of the serious felony priors. The trial court imposed and struck the punishment for the prison prior and the second serious felony prior.

## II

## ARGUMENT

A. *Claims of Error Affecting the Conviction*

    1. *Evidence Ozuna was in custody when he threatened Wilcock*

Ozuna argues the trial court erred and violated his constitutional right to a fair trial by admitting evidence of his threats to get Wilcock to recant and change his story without obscuring that the encounter occurred while the two men were incarcerated.

Ozuna argues the location where he allegedly threatened Wilcock—on a jail bus, as Ozuna was sitting in a cage behind Wilcock—had no probative value and was unduly prejudicial under Evidence Code section 352. In his view, "[t]here was no probative value in the jury knowing that appellant was in custody, put on the same bus as [Wilcock], and behind a cage. Further, the evidence was prejudicial. Evidence of a defendant's custodial status, like evidence of other crimes, suggests criminal propensity and is likely to result in jurors having a negative perception of the defendant."

The challenged evidence came in through a recording of Wilcock's statement about his encounter with Ozuna. The prosecution offered the prior statement to impeach Wilcock's testimony that Ozuna was not the person who stabbed him. On the recording, Wilcock said Ozuna and two of his "goons" got on a bus and sat right behind him

8

"behind the cage" as they were transported to court. Ozuna warned him against testifying that he was the attacker and suggested blaming someone else. Wilcock subsequently changed his story to match what he had reported Ozuna told him to say.

Before trial, the trial court recognized there could be some prejudice from allowing the jury to know Ozuna was in custody. "We strive hard to sanitize as much of these cases as we can, and if the jury learns that . . . Mr. Ozuna is in custody . . . there is some prejudicial effect based on that evidence. I'm not sure if it can be sanitized, however." Defense counsel asked that the recording be redacted so it did not mention the setting where the threat occurred. However, the court determined the context was relevant and important enough that "the probative value of this evidence is not substantially outweighed by undue prejudice."

"Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is defined as 'evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.) ' "Prejudice," as used in Evidence Code section 352, is not synonymous with "damaging." [Citation.] Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual and has little to do with the legal issues raised in the trial.' " (*People v. Miles* (2020) 9 Cal.5th 513, 587-588.)

9

Trial courts have broad discretion under those provisions of the Evidence Code to determine the relevance of evidence and also has broad discretion under Evidence Code section 352 to exclude relevant evidence if the probative value of the evidence is substantially outweighed by its possible prejudicial effects. (*People v. Miles*, *supra*, 9 Cal.5th at p. 588.) We review those rulings for abuse of discretion and will not overturn them " '*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Id*. at pp. 587-588.)

Here, the evidence of Ozuna's threats went to a core issue of the trial—whether Wilcock was lying when he testified that Ozuna was not the man who stabbed him. Wilcock reported that Ozuna threatened him in the confined space of a jail bus while the two were being transported to court for proceedings in this case. The threat itself is obviously relevant, but so is the setting in which it occurred. Wilcock was being held as a material witness who had refused to appear in court when Ozuna issued the threat. He was not free to distance himself from Ozuna and his "goons." The trial court could reasonably have concluded the evidence of incarceration was relevant to Wilcock's state of mind, the seriousness with which he took the threat, and therefore the likelihood that he changed his story as a result. For the same reasons, we also conclude the trial court reasonably found the prejudice from allowing the jury to infer Ozuna was incarcerated at the time of trial did not substantially outweigh the probative value of hearing Wilcock's statement reporting Ozuna's threats.

## 2. *Testimony conveying the statement of the unknown attacker*

Ozuna argues the trial court erred and violated his constitutional right to a fair trial by allowing Wilcock's testimony that the man he accused of stabbing him "said something in the lines of 'You stole from Crow'" before he lunged for Wilcock's backpack and began stabbing him. He argues the statement was hearsay and should not have been allowed as nonhearsay because the only purpose for the statement was to prove the fact asserted.

"Hearsay is an out-of-court statement offered for the truth of its content. [Citations.] Conversely, '[w]hen an out-of-court statement is offered for any relevant purpose other than to prove the truth of the matter stated, the statement is not hearsay.' [Citations.] [¶] When considering whether an out-of-court assertion is nonhearsay, '[t]he first, and most basic, requirement for applying the not-for-the-truth limitation . . . is that the out-of-court statement must be offered for some purpose independent of the truth of the matters it asserts. That means that the statement must be capable of serving its nonhearsay purpose regardless of whether the jury believes the matters asserted to be true.'" (*People v. Portillo* (2023) 91 Cal.App.5th 577, 590.) We review the trial court order allowing the testimony over the hearsay objection for abuse of discretion. (*Id*. at pp. 588-589.)

Here, the challenged testimony was offered to explain Wilcock's state of mind and the unknown bald man's motivation. It was not offered for its truth, that is, to establish that Wilcock had stolen from Ozuna. Indeed, one of the few consistent parts of Wilcock's

11

story was that Ozuna had falsely accused him of stealing something from him, and the alleged theft was the motive for the stabbing.

Our Supreme Court addressed this situation in *Hart v. Keenan Properties, Inc.* (2020) 9 Cal.5th 442, 447-448. "[S]uppose A hit B after B said, 'You're stupid.' B's out-of-court statement asserts that A is stupid. If those words are offered to prove that A is, indeed, stupid, they constitute hearsay and would be inadmissible unless they fell under a hearsay exception. However, those same words might be admissible for a nonhearsay purpose: to prove that A had a motive to assault B. The distinction turns not on the words themselves, but what they are offered to prove. The concept can prove analytically elusive when the words themselves also make an assertion. [Citation.] If the words are admitted for a nonhearsay purpose the jury is not allowed to consider the truth of any substantive assertion, and is often instructed to that effect." (*Ibid.*)

That is precisely what happened here. Wilcock sought to make his new story more plausible by suggesting the unnamed man was motivated to stab him out of affinity for or loyalty to Ozuna. The statement was therefore relevant for a nonhearsay purpose and, as the trial court ruled, not offered for the truth of the matter asserted. Admitting the testimony was not an abuse of discretion.

### 3. *Prosecutorial misconduct in closing argument*

Ozuna argues the prosecutor committed misconduct and violated his constitutional right to a fair trial by stating in closing argument that Wilcock's blood was on the knife found inside his backpack.

12

During closing argument, the prosecutor said, "That first knife was found in Mr. Ozuna's right front pants pocket. That knife was clean. That second knife that had Shane Wilcock's blood on it that Mr. Ozuna knew had Shane Wilcock's blood on it, he had placed inside of that plastic bag so it wouldn't contaminate the rest of his contents of his backpack, and concealed that knife in his backpack."

Ozuna argues this statement misrepresented the evidence to the jury. In his view, the claim that Wilcock's blood was on the knife "was not correct," and the prosecutor knew that because "[t]he detective testified he was unaware of testing done on the knife, he personally did not send it out for testing, that if the substance was blood, no match was made to confirm the source was [Wilcock]."[3]

In closing argument, a prosecutor must not use deceptive or reprehensible methods to persuade the jury. (*People v. Rowland* (1992) 4 Cal.4th 238, 274.) However, "[t]he prosecution may argue all reasonable inferences from the record, and has a broad range within which to argue the facts and the law." (*People v. Daggett* (1990) 225 Cal.App.3d 751, 757.) In closing, counsel may "urge whatever conclusions counsel believes can properly be drawn from the evidence," but "may not assume or state facts not in evidence or mischaracterize the evidence." (*People v. Harrison* (2005) 35 Cal.4th 208, 249.)

---

[3] Ozuna did not object to this argument at trial, which he acknowledges on appeal. He argues we have discretion to reach the issue and, in the alternative, that his trial counsel was ineffective for failing to object. We agree we have discretion to reach the merits and do so here rather than evaluating whether counsel performed ineffectively. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)

13

Here, the prosecutor did not misstate the evidence in any way. He argued the jury could reasonably infer from the evidence that Ozuna was in possession of a knife with Wilcock's blood on it. That inference was supported by Wilcock's statements to police that Ozuna had stabbed him and by the detective's statement that he found in Ozuna's possession a knife he believed had dried drops of blood on the blade and handle. While it is true that the prosecution did not put on DNA evidence confirming the officer's opinion or linking the blood directly to Wilcock, the prosecutor did not suggest such evidence existed. If there were any doubt, his rebuttal argument makes clear he was asking the jury to infer Ozuna's guilt from circumstantial evidence that he was in possession of the knife used to stab Wilcock.

We therefore conclude the prosecutor's argument was proper and Ozuna's appeal on this ground fails on the merits.

B. *Claims of Sentencing Error*

1. *Refusal to strike prior strike convictions*

Ozuna admitted having three prior strikes within the meaning of the "Three Strikes" law. The trial court denied Ozuna's motion to strike them, and Ozuna argues the trial court abused its discretion by denying his motion.

Ozuna had three strike prior convictions. In 1981, he was convicted of voluntary manslaughter. (§ 192.) In 1997, he was convicted of assault on a peace officer causing great bodily injury (§ 245, subd. (c)) and mayhem (§ 203). Ozuna argued the strike prior convictions were "very, very old," he was already 64 years old, and "a sentence in the

14

low to mid two digits" would "ensure the safety of the community." The prosecution opposed striking the old convictions despite their age because Ozuna had kept up his criminal lifestyle, and had been sentenced to prison for a total of 35 years 8 months over the ensuing 41 years. The prosecution also emphasized Ozuna's current conviction was violent and involved evidence the jury credited that he had successfully threatened a witness.

The trial court declined to strike the strike priors. It recognized the convictions were remote, and that the probation report described Ozuna as having a difficult childhood. However, it concluded he remained a danger to the community because he continued to commit violent felonies and other crimes.

The purpose of the Three Strikes law is to punish recidivists more harshly. (*People v. Davis* (1997) 15 Cal.4th 1096, 1099.) Not all recidivists fall within the spirit of the law, however, so trial courts may exercise their discretion to strike or dismiss a prior conviction in the furtherance of justice. (§ 1385, subd. (a); *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 504.) "When considering whether to strike a prior conviction, the factors a court considers are whether, in light of the nature and circumstances of the defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of the defendant's background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though the defendant had not previously been convicted of one or more serious and/or violent felonies." (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1140, quoting *People v. Williams*, *supra*, 17 Cal.4th at p. 161.)

15

"We review a trial court's ruling on a *Romero* motion under the deferential abuse of discretion standard, which requires the defendant to show that the sentencing decision was irrational or arbitrary. [Citation.] It is not enough that reasonable people disagree about whether to strike a prior conviction. [Citation.] The Three Strikes law 'not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm . . . [T]he law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper.' " (*People v. Avila*, *supra*, 57 Cal.App.5th at p. 1140.) "Abuse of discretion in failing to strike a prior conviction occurs in limited circumstances: where the trial court is not aware of its discretion; where the trial court considers impermissible factors; or where applying the Three Strikes law would produce an arbitrary, capricious, or patently absurd result under the specific facts of a particular case." (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1029 (*Dryden*).)

Ozuna's primary argument for concluding the court abused its discretion is that the strike offenses were very old. While that is true—the manslaughter conviction occurred 43 years ago, and the mayhem and assault-on-a-peace officer convictions occurred 27 years ago—remoteness of prior convictions does not on its own take a defendant out of the spirit of the Three Strikes law. (*People v. Avila*, *supra*, 57 Cal.App.5th at p. 1141.) Instead, remoteness is a factor in mitigation. (*Ibid.*) The trial court was aware of and treated the age of the convictions as weighing in favor of striking the strikes, but the court properly also considered that Ozuna appeared to have led "a continuous life of crime,"

aside from long periods of incarceration, rather than a "'legally blameless life.'" (*People v. Humphrey* (1997) 58 Cal.App.4th 809, 813.) Those crimes included, as the trial court noted, the latest crime of inflicting great bodily harm as well as evidence the jury accepted that he used threats to dissuade a witness from testifying.

Ozuna relies on *Dryden*, but that case is distinguishable. As here, *Dryden* involved a long sentence likely to exceed the defendant's lifespan. In *Dryden*, the appellate court determined the sentence "presents that rare instance of an absurd result under the Three Strikes law that goes beyond mere disagreement with the trial court's decision." (*Dryden*, *supra*, 60 Cal.App.5th at p. 1031.) The appellate court therefore reversed the sentence and remanded to the trial court to reconsider striking one or more prior strikes. However, the new crime in *Dryden* differed substantially from Ozuna's new crime. In *Dryden*, the "criminal behavior . . . resulted from a late-night, spontaneous altercation between an intoxicated and mentally ill homeless person and a group of youths. Defendant struck two members of a group of five young men with a bamboo stick, scratching one and raising a welt on the neck of the other." (*Ibid.*) Here, Ozuna believed Wilcock had stolen from him, hunted him down, and stabbed him twice. While the injury did not kill Wilcock, it was life-threatening and required that he be airlifted to a hospital capable of treating his injuries. We find nothing arbitrary in the trial court's ruling.

2. *Refusal to strike serious felony prior*

The trial court imposed two serious felony prior enhancements under section 667, subdivision (a), but struck the punishment for one of them, leaving him with one five-

17

year enhancement. Ozuna argues the trial court abused its discretion by refusing to strike the punishment for the second enhancement.

Section 1385 grants the trial court the authority "to strike or dismiss an enhancement" or "strike the additional punishment for that enhancement in the furtherance of justice." (§ 1385, subd. (b)(1).) As amended by Senate Bill No. 81, effective January 1, 2022, section 1385 now says "the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385, subd (c)(1); Stats. 2021, ch. 721, § 1.)

Whether dismissal of an enhancement is in the furtherance of justice is a discretionary call for the trial court. (*People v. Walker* (2022) 86 Cal.App.5th 386, 395, affd. but criticized (2024) 16 Cal.5th 1024.) " 'In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. "Endanger public safety" means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.' " (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 295(*Mendoza*).)

Here, at least three of the listed mitigating factors are relevant: the offense is connected to prior victimization or childhood trauma, the enhancement is based on a conviction over five years old, and the case involved multiple alleged enhancements. We review a trial court's decision not to strike a sentence enhancement or punishment for abuse of discretion, including the determination whether dismissal would endanger public safety. (*Mendoza*, *supra*, 88 Cal.App.5th at p. 298.)

In this case, we need not reach the issue because Ozuna failed to raise it in the trial court. As we discussed in part II.B.1., *ante*, Ozuna moved to strike some enhancements under section 1385. However, the motion focused entirely on avoiding the impact of the Three Strikes law. Though the new law directing the trial court to consider certain mitigating factors had been in effect for over a year, neither Ozuna's brief nor his argument at the sentencing hearing mentioned the prior serious felony enhancements, and he never asked the trial court to exercise its discretion under section 1385, subdivision (c) to strike the enhancements or the punishment. "[A]ny failure on the part of a defendant to invite the court to dismiss under section 1385 . . . waives or forfeits his or her right to raise the issue on appeal." (*People v. Carmony* (2004) 33 Cal.4th 367, 375-376.) Ozuna does not address the forfeiture in his opening brief, and in his reply brief notes the People's argument but argues only that the trial court did not understand the scope of its discretion under the new statute. We conclude the trial court was not invited to exercise that discretion, and Ozuna therefore forfeited the issue.

19

## III

## DISPOSITION

We affirm the judgment and the sentence.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
                                                    J.

We concur:

RAMIREZ _____
                    P. J.

FIELDS _____
                    J.